[Criminal No. 382.   Filed February 3, 1917.]

[162 Pac. 607.]

## BEN MERRIWETHER and CHARLES DINGLE, Appellants, v. STATE, Respondent.

1. CRIMINAL LAW—APPEAL—DISCRETION OF TRIAL COURT—ORDER OF PROOF.—The order of proof at the trial of a criminal prosecution rests largely in the discretion of the trial court, and his rulings will not be disturbed on appeal unless the record discloses an abuse of discretion to the substantial injury of the party complaining.

2. CRIMINAL LAW—APPEAL—DISCRETION OF TRIAL COURT—ORDER OF PROOF.—Where the record clearly showed that admissions by accused were voluntary and the same admissions were made in substance in their testimony, no abuse of the trial court's discretion as to the order of proof is shown.

3. HOMICIDE—EVIDENCE—SUFFICIENCY—FIRST DEGREE MURDER.—In a prosecution of two defendants for homicide, circumstantial evidence connecting one of them with the offense *held* sufficient to sustain a conviction of murder in the first degree, regardless of admissions by him and the testimony of his codefendant.

**4.** HOMICIDE—EVIDENCE—ADMISSIONS—SUFFICIENCY.—In a prosecution
for the murder of a chauffeur, where each of the two defendants
admitted that he was present at the homicide, but declared that the
other fired the fatal shot, the admissions of the one not connected
with the crime by circumstances, that he and his codefendant hired
the automobile to aid in deserting from the army, that his code-
fendant asked him to drop his hat so as to stop the car in order
that he might kill the driver, and that he did so after some pro-
testing, but not under apprehension, showed that he assisted in the
commission of the crime so as to sustain a verdict of first degree
murder without the testimony of his codefendant accusing him of
firing the fatal shot.

[As to confession of defendant as sufficient corroboration of
accomplice, see note in **Ann. Cas. 1916C,** 570.]

APPEAL from a judgment of the Superior Court of the
County of Cochise. A. C. Lockwood, Judge. Affirmed.

Mr. James S. Casey, for Appellants.

Mr. Wiley E. Jones, Attorney General, and Mr. R. Wm.
Kramer and Mr. G. W. Harben, Assistant Attorneys General,
for the State.

CUNNINGHAM, J.—The information charges the appel-
lants jointly of the deliberate and premeditated murder of
Armando Hernandez on or about the sixth day of February,
1915, by shooting him with a rifle. The defendants were
jointly tried and convicted of murder of the first degree. The
jury by their verdict fixed the punishment at death. The
court passed separate sentences and fixed the date for the
execution of each defendant in satisfaction of the judgment
on the fourth day of June, 1916. From the order refusing a
new trial and from the judgments, the defendants have ap-
pealed.

The court permitted the introduction of evidence of admis-
sions by the defendants over the objection of defendants upon
the ground that sufficient proof of the voluntary nature of
the admissions had not been made to appear. This action of
the court and the giving by the court of certain paragraphs
in the instructions, and the sufficiency of the evidence to sus-
tain the convictions, are assigned as error.

The order of proof at the trial is a matter resting largely in the discretion of the trial court, and will not be disturbed by the appellate court unless the record discloses an abuse of discretion to the substantial injury of the rights of the party complaining. The record here presented does not show such an abuse of the discretion in the matter as would call for a reversal of the cause, for the reason the record is full of evidence tending to show that the admissions made were voluntarily made, and the same admissions in substance were made in court by the defendants while testifying as witnesses in their respective cases.

The instructions which are the subjects for other assignments of error are free from the criticisms offered by appellants. In each instance the instruction attacked by the assignment follows in language instructions given by trial courts in like circumstances, and where attacked have been treated as properly stating the law, either directly or as of course, by appellate courts so often that they are usually considered elementary and proper as of course; and such is the conclusion I have reached in this instance. The complaint of the instruction is without merit.

The real question of merit presented by the appeal and urged by the appellants is whether the conviction of these appellants is sustained by competent substantial evidence.

The evidence clearly establishes the following facts, viz.: The death of Armando Hernandez was caused by a rifle shot which entered his body from the back a little below the level of the shoulder and passed out of his body on a line with the chin, shattering the sternum or breast bone; that the effect of the shot was instant death; and that the shot actually caused the death. The dead body was found lying on the ground beside an automobile. The automobile was found standing along the south side of the main traveled roadway of the state highway running from Douglas to Bisbee in Cochise county, Arizona, about seven miles west from Douglas. The machine was headed west towards Bisbee and from the direction of Douglas. The body was lying on the ground on the south side of the machine, with the head towards the west and the feet towards the east. Blood was found in the driver's seat, on the floor of the machine, and on the steps of the machine, also on the ground around the

body. The glass wind shield of the machine was broken in front of the driver's wheel and on a line with the wounds found on the body, if the deceased was seated in the driver's seat at the time he was shot. Shoe tracks were found on the ground about the machine and the body, and an empty Springfield army rifle cartridge shell was found on the ground near the right side and near the rear of the machine. The officers followed tracks leading from the machine and body across the road in a northerly direction, then out on the desert. The character of the surface of the ground was such as to show the clear imprint of the shoes worn by the persons making the tracks, and from the tracks two persons had gone that way, walking so that the tracks followed a parallel course as if they walked together. Near the trail made by the tracks was found an army overcoat, and when picked up it was found to have a quantity of blood on it. The coat proved to belong to a trooper, named Mason, and he had reported the loss of the coat by theft early that morning. Some of the tracks found on the trail mentioned were marked by the officers for future identification.

The foregoing facts were discovered by the officers early on a Sunday morning. Later in the same day the army camp at Douglas was visited, and an examination of the troopers' rifles disclosed that the rifle belonging to defendant Ben Merriwether had been discharged since the inspection on the day previous. The empty shell found near the scene of the homicide was that of the ammunition issued to the troopers having rifles such as Merriwether's and exactly fitted his rifle. Merriwether was arrested and taken to the scene of the homicide. His shoes were examined and found to contain in the heel of one the peculiarity of tacks that exactly corresponded with one of the marked tracks, and, when a track was made by the shoe alongside of the marked track they were identical in tack marks and otherwise. Blood marks were found on Merriwether's shoes and on his shirt, and what was said to be blood was found on his rifle. Merriwether explained that the blood got on his clothes from a camp dog that was injured by a horse. He had carried the dog in his arms to a tent. Then he admitted that he made the tracks in question, and was present at the time of the homicide. He told his story, leading up to the homicide, and directly charged his

codefendant, Dingle, with the act of killing. The codefendant was then in the guardhouse of his troop, and the party, consisting of the officers, went with the defendant Merriwether to the army camp for the purpose of finding defendant Dingle and confronting him with Merriwether and Merriwether's story of the killing. Dingle was found under guard in the guardhouse, where he had been placed a day or two previous upon a charge of violating the army regulations. When confronted by Merriwether and the peace and army officers, he denied, at first, all knowledge of the homicide; but later he, too, made a statement, leading up to the homicide, in the main features very closely resembling the story told by Merriwether, and he admitted that he, too, was present at the killing of Hernandez and saw the act, but that Merriwether alone committed the crime; that he accompanied Merriwether from the scene of the crime out into the desert; that they discarded the bloody overcoat of Mason's, and returned together to the environs of Douglas, where they separated, he returning to the guardhouse.

The stories of the two defendants were separately taken down on a typewriter and separately sworn to by the defendants. They each testified as witnesses on the trial. The statements made, and their testimony given, which in all essential particulars is the same as their respective statements, agree in a few particulars: First, they agree that their joint purpose in leaving Douglas that night was to desert, or for one of them to desert, from the army; next, that as a means of deserting they got an automobile and started to drive to Naco; that they would meet for the trip at the "colored church" in Douglas; that they did meet at the place agreed upon, and Merriwether employed the deceased to take them in the automobile he was driving for hire to Naco; that they started on the trip, and at the place where the dead body was found the machine was stopped, and the driver was shot with Merriwether's army rifle by a person standing on the ground to the right and to the rear of the machine; that the person who fired the shot extracted the empty shell at that point; that the dead body was pulled out of the machine and Mason's overcoat put in the driver's seat; that efforts were made to start the machine, but the efforts failed; and that the two de-

fendants left in a northerly direction, disposed of the overcoat, and returned to the army camp at Douglas.

Their evidence disagrees as to the following:

Dingle says that, when he first saw Merriwether at the church, their agreed meeting place, Merriwether was wearing Mason's overcoat, and had his (Merriwether's) rifle hid under the coat. Merriwether says, when he first saw Dingle at the church, Dingle was wearing Mason's coat, and had his (Merriwether's) rifle hid under the coat.

Dingle says after they met at the church Merriwether said, as they had no money, they must hold up and rob some one and get money, and following up this declaration they went out on a street, and, meeting a man in the dark, Merriwether asked the man for a match, and then struck him down with the gun, used as a club, and began searching the man. The man being robbed holloed, and someone came to answer his call. Both defendants ran.

Merriwether, in his statement, does not refer to the incident of the assault and attempted robbery, and as a witness denies the matter. He states that he had $30 in money, and at another time that he had $10, and at still another time that the fare by automobile to Naco was $20, and that he had money enough to pay the fare for both and his return to Douglas and have a little money left.

Dingle says that Merriwether had the rifle under his coat while he was getting the automobile and at all times during that episode; and Merriwether states nothing about who had the rifle at the time of starting, but states that Dingle had the rifle at all times until they reached Douglas on their return.

Dingle says that they got in the automobile and started for Bisbee, and when they got about two miles from Forrest, Merriwether told him that he (Merriwether) intended to kill the driver, and ordered him (Dingle) to drop his hat and get out for the hat; that he did as Merriwether ordered him to do; and that Merriwether stopped the automobile and let him out for the hat. Merriwether states that, when they had reached the point on the road, Dingle stopped the automobile, giving another reason for stopping.

Dingle states that, when he had recovered his hat and was returning to the automobile, Merriwether got out of the car, and stepping to the rear raised the rifle and shot the driver.

Merriwether states that, when Dingle returned to the car, he (Dingle) said that he was going to kill the driver and take the car; that, after some propositions were made by him to Dingle, in an effort to dissuade Dingle from killing the man, Dingle shot and killed the driver.

In their statements they agree that the body was pulled out of the car and both made apparent efforts to start the car and failed. They agree that they had an understanding in case they were charged with the offense that they would lie about it, and in their testimony they each admit they lied at first about the matter.

Thus, we find two defendants jointly tried, represented by the same counsel, and the facts relied upon by each for a defense necessarily damaging to the defense of the other— two causes, separate and distinct in every particular of their defenses, except that they are jointly charged and tried and represented by the same attorney. In order to free one of the charge, the other must be shown to be guilty. The counsel in his brief claims some unusual features for this case, and I think his claim is justified.

The evidence establishing the *corpus* of the crime is clear, convincing and without conflict that the deceased was violently killed, and that the party or parties who killed him acted deliberately and with a formed design to take his life, therefore committing murder of the first degree. The circumstances surrounding the perpetration of the crime and pointing to the perpetrator are the facts that Ben Merriwether's rifle was the rifle used from which the shot was fired that caused the death; that tracks were imprinted in the ground at and near the place of the killing that were identical with tracks made by a shoe worn by Ben Merriwether on the morning after the night of the killing and the shoes belonged to Ben Merriwether; and that blood was on Merriwethers' clothes, shoes and gun. These circumstances, in the absence of any explanation from Ben Merriwether, point to but one rational conclusion, viz., that Ben Merriwether was present at the scene of the killing at the time the shot was fired, and that he fired the shot from his rifle. No hypothesis reasonable with his innocence can be drawn from these circumstances. Without Dingle's testimony, and without Merriwether's admission that he was present at the scene of

the killing, the circumstances inevitably connect him with the commission of the homicide.

He offers an explanation of his presence at the homicide in the manner of denying that he had the possession of his own rifle then, but claimed that Dingle had possession of his (Merriwether's) rifle, denying that he fired the shot but asserting that Dingle fired the fatal shot, and asserting that Dingle's express purpose at the time of firing the shot was to kill the driver and appropriate the automobile in the possession of the man driving it. So far as Merriwether's defense is concerned, it was the sole province of the jury to determine whether his explanation was sufficient to raise a reasonable doubt of his guilt when considered with all the other testimony in the case, and the verdict finding him guilty as charged is a complete answer in the negative. The evidence is sufficient to sustain the verdict against Merriwether, if all of the testimony given by Dingle and Merriwether's admissions be excluded.

Was Dingle an accomplice of Merriwether, or did Dingle, being present, aid and assist Merriwether in the perpetration of the crime?

If Dingle's relation to Merriwether was that of an accomplice, then Merriwether's testimony connecting Dingle with the commission of the crime would require corroboration; but Merriwether claims that Dingle was the principal, and that he (Merriwether) was forced to aid and assist Dingle. Thus, Merriwether repudiates the idea that they were accomplices in the murder. Dingle, in his testimony, also repudiates the idea of the relation of accomplices; but the admissions made by Dingle in his statement at the time of his arrest, and in open court at the trial, dispense with corroborative evidence of the facts admitted against interest by him. He admits that he was present at the homicide; that he was informed by Merriwether that he (Merriwether) was about to kill the deceased; and that thereafter Dingle did actually drop his hat from the machine, while it was running, in order to give an excuse for stopping the machine, and thereby render aid and assistance to Merriwether in perpetrating the crime. Dingle, according to his testimony, rendered this aid to Merriwether in the following described circumstances:

"Then, after we got about two miles from Forrest, he said to me, 'Dingle, drop your hat.' I says, 'Why?' He says, 'I am going to kill this fellow,' and then he says, 'Can you run an automobile?' and I says, 'I can't drive a Hudson.' He says, 'Can't you drive it at all?' and I says, 'No, I can't drive it. I don't know anything about a Hudson.' And he says, 'Well, you drop your hat,' and I said, 'Merriwether, I wouldn't kill the poor man,' and he says, 'You go ahead and drop your hat as I tell you,' and I says, 'Why don't you wait until you get to Naco and get one there, and then we get out if you like, and tell the chauffeur to go ahead, but I wouldn't kill him, for we are liable to have bad luck,' and he says, 'All right, drop your hat,' and I says, 'What do you want me to drop my hat for?' and he says, 'Go ahead and do as I tell you.' Well, I dropped my hat, and, when the chauffeur drove on, Merriwether told him to stop, that I dropped my hat, and he stopped, and I picked my hat up and started to go on off, but the chauffeur started backing back that way, and he stopped the car, and I picked my hat up, and I looked, and I says, 'Well, I must have talked him out of the notion, and I will go on,' and about the time I got in about ten feet of the car, just about that time Merriwether jumped out, and he up with his rifle like that [indicating], and I said, 'Merriwether!' But before I could get the other word out the sound of the rifle killed the word, and then I turned around and started to run off. . . . "

Dingle has thereby conclusively admitted that he was present at the commission of the murder; that he had previous knowledge of the intention of Merriwether to murder the driver; and that Merriwether's purpose for killing the driver was to appropriate the machine he was driving, to finish their trip, and make a "get-away" without the knowledge of any living witness. To carry out this purpose, it becomes apparent to a reasonable person that the machine would have to be stopped. As the first step in carrying out the design, some excuse must be found for stopping the car. Merriwether suggested an excuse, and Dingle followed the suggestion knowingly and willingly. Dingle does not intimate that he dropped his hat under apprehension of the carrying out of any threat from Merriwether. He mentions threats made and acts performed by Merriwether, which would induce

fear; but all of these threats were made and acts performed after the murder was actually committed, not before Dingle dropped his hat and the machine was stopped.

The jury were justified in drawing the inference from Dingle's testimony that Dingle aided and abetted Merriwether in murdering the deceased, and that he is therefore equally guilty as a principal. The evidence sustains the verdict and the judgment.

The judgments are without reversible error, and are affirmed.

FRANKLIN, C. J., and ROSS, J., concur.